IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JOSEPH W. JANSSENS III, Appellant, | * * * | |
| v. | * * | Civil No. JFM-10-2042 |
| FREEDOM MEDICAL, INC., Appellee-Cross Appellant | * * * | |

******

MEMORANDUM

Now pending before this Court is Appellant Joseph Janssens III's ("Janssens") Appeal and Appellee Freedom Medical, Inc.'s ("Freedom") Cross-appeal from an Order and Money Judgment issued by the United States Bankruptcy Court for the District of Maryland ("Bankruptcy Court"). Janssens filed a voluntary Chapter 7 bankruptcy petition in the Bankruptcy Court in December 2007. On June 15, 2010, the Bankruptcy Court found that Janssens was liable to Freedom in the amount of $189,375.93 and that this debt was nondischargeable. Both parties now appeal. The Order and Money Judgment will be affirmed, and this case will be remanded to permit the Bankruptcy Court to consider Freedom's motion for attorneys' fees and costs.

I.

Freedom is a Pennsylvania corporation engaged in the business of selling, renting, and repairing biomedical equipment. It was formed in 1997 by Frank Gwynn ("Gwynn") and Dominic Greco ("Greco"), and, in 2000, Gwynn and Greco recruited Janssens to become the regional manager of Freedom's Baltimore branch. At the time he was hired, Janssens signed an employment letter requiring that he use the company's confidential, proprietary information— including customer contacts—only for Freedom's benefit. In addition, he entered into a "Non-

1

Disclosure, Non-compete, Property Rights Agreement" which contained a similar limitation on his use of Freedom's confidential information; barred him from working, without Freedom's consent, for himself or another entity in competition with Freedom during and for one year after his period of employment; and provided that Freedom had a right to reimbursement for fees and costs, including attorneys' fees, incurred in connection with an attempt to enforce the Agreement. Finally, Janssens received an employee handbook, which included similar restrictions. (Bankr. Ct.'s Mem. Op., June 15, 2010 ("Mem. Op."), Findings of Fact ¶¶ 1–5.)

Freedom's revenues began to decline in 2004, and, at the end of that year, it sought reorganization under Chapter 11 of the Bankruptcy Code. Freedom's bankruptcy case was closed on June 21, 2006. During an investigation of the reasons for the declining revenue, Gwynn and Greco discovered that equipment owned by Freedom was missing. Eventually, they determined that it was being rented by another entity that employed former Freedom employees. (*Id.* ¶¶ 6–8, 10.)

Initially, the Baltimore branch flourished under Janssens's leadership, but its revenues also began to decline in 2004. Concerned about this decrease and about reports that Janssens was absent when needed at the branch, Gwynn and Greco met with him on several occasions. At one such meeting during the summer of 2005, Janssens expressly denied working for anyone other than Freedom. Gwynn and Greco ultimately concluded that the Janssens was "completely inattentive to the business," and he was terminated on April 7, 2006. (*Id.* ¶¶ 8–9.)

In fact—as Gwynn and Greco later learned—Janssens had begun working for other entities, Quality Medical South (now Quality Medical Rentals, LLC) and Quality Medical Group (collectively, "Quality"), in 2004. The parties disputed the nature and motivation of this work. Janssens claimed that he facilitated rent-to-own transactions and servicing of equipment through

Quality because Freedom was unable or uninterested in this type of business. The Bankruptcy Court found, however, that Janssens engaged in "a pattern of misconduct whereby [he] solicited business from customers of Freedom on behalf of Quality and sold or rented equipment to them." (*Id.* ¶¶ 10–16.) It rejected Janssens's benevolent explanations for his conduct, concluding instead that Janssens was motivated by the larger commissions he received from Quality. (*Id.*, Conclusions of Law ¶ 32.) From March 1, 2004, to April 7, 2006, during the period that Janssens was soliciting business for Quality, Freedom paid him $189,375.93 in salary and commissions. (*Id.*, Findings of Fact ¶ 13.)

In July 2006, Freedom sued Janssens and 22 other defendants in the United States District Court for the Eastern District of Pennsylvania in *Freedom Medical, Inc. v. Gillespie*, Case No. 06-3195 ("*Freedom I*"), asserting claims relating to the missing equipment. Freedom argued that Janssens was liable for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), conspiracy, fraud, and breach of fiduciary duty. Finding that Freedom failed to prove Janssens's involvement in the theft of equipment, the District Court granted Janssens's motion for summary judgment on the RICO claims. It dismissed the remaining claims without prejudice for lack of jurisdiction. (Mem. Op., Findings of Fact ¶ 11; *Id.*, Conclusions of Law ¶ 4.) Freedom filed suit against Janssens and Quality in the United States District Court for the Eastern District of Pennsylvania on December 27, 2007. In that action, styled *Freedom Medical, Inc. v. Janssens*, Case No. 07-4286 ("*Freedom II*"), it alleged fraud, misappropriation of trade secrets, and breach of fiduciary duty. Quality and Freedom reached a settlement under which Quality paid $50,000 for a release of all claims. (*See* Appellant's Br., App., Def.'s Exs. 17–19, at A239–55.) The action was stayed as to Janssens because Janssens filed a bankruptcy petition in this District. (*Id.*, Findings of Fact ¶¶ 18–19.)

Freedom then initiated an adversary proceeding in the Bankruptcy Court. A trial was held from May 4 to May 6, 2009.

On June 15, 2010, the Bankruptcy Court issued a memorandum opinion. It held that Janssens committed violations of Pennsylvania law, including breach of fiduciary duty, embezzlement, fraudulent misrepresentation, and breach of contract, but that Freedom failed to prove Janssens engaged in tortious interference with prospective contractual relations. (*Id.*, Conclusions of Law ¶¶ 23–39.) It rejected Janssens's affirmative defenses, including his invocation of the unclean hands doctrine, and found in Freedom's favor on Janssens's counterclaims. (*Id.* ¶¶ 2–15.) The Bankruptcy Court awarded damages to Freedom in the amount of the wages and commissions Freedom paid to Janssens while he was working for Freedom's competitors; however, the Court denied damages for lost profits because Freedom failed to submit sufficient evidence to permit it to determine the amount of these damages with "reasonable certainty." (*Id.* ¶¶ 40–46.) Freedom's claim, the Bankruptcy Court concluded, was nondischargeable in bankruptcy. (*Id.* ¶¶ 50–62.) Finally, while the Bankruptcy Court found that there was an enforceable agreement requiring Janssens to reimburse Freedom for attorneys' fees and costs, it denied an award of such fees and costs because Freedom had not submitted relevant documentation. (*Id.* ¶ 49.) Freedom subsequently submitted the requisite documentation, but, by that time, the Bankruptcy Court had been divested of jurisdiction as a result of the parties' appeals. (Appellee/Cross-Appellant's Reply Br., Supp. App., at FA000303–39.)

Janssens appeals the following issues:

1. Did the Bankruptcy Court apply the wrong legal standards or misapply the legal standards in determining whether Janssens debt to Freedom is nondischargeable under 11 U.S.C §§ 523(a)(2)(A), (a)(4), and (a)(6)?
2. In assessing damages, did the Bankruptcy Court err in awarding Freedom the full amount of Janssens's compensation during the period of his disloyalty?

4

3. Was the Bankruptcy Court incorrect in resolving Janssens's counterclaims in Freedom's favor, and, in deciding these claims, should it have admitted evidence of settlement negotiations between the parties?[1]

Freedom raises the following issues in its cross-appeal:

1. Did the Bankruptcy Court commit errors of fact and law in denying Freedom's claim for tortious interference with prospective contractual relations?
2. Did the Bankruptcy Court make factual or legal errors in denying Freedom lost-profits damages?
3. Did the Bankruptcy Court err in denying Freedom an award of reasonable attorneys' fees and costs?

II.

On appeal, a district court reviews a bankruptcy court's "findings of fact for clear error and questions of law *de novo*." *Duncan v. Duncan (In re Duncan)*, 448 F.3d 725, 728 (4th Cir. 2006). An abuse-of-discretion standard applies in reviewing the application of law to facts. *Matusda Capital, Inc. v. Netfax Dev., LLC (In re Netfax, Inc.)*, 335 B.R. 85, 91 (D. Md. 2005). A district court may find an abuse of discretion "'where the [bankruptcy court's] decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact.'" *Id.* at 92 (quoting *In re Marvel Entm't Grp., Inc.,* 140 F.3d 463, 470 (3d Cir. 1998)); *see also Quillen v. Guttman*, Civil No. RDB 09-1986, 2010 WL 1416122, at *2 (D. Md. Apr. 5, 2010).

---

[1] In his brief, Janssens also argues that Freedom's recovery should be denied as a result of its unclean hands. He did not, however, list the rejection of his unclean-hands defense as an issue for appeal in the brief or in the statement of issues for appeal that he submitted (ECF No. 3). Moreover, the Bankruptcy Court did not err in rejecting this defense. The doctrine of unclean hands bars recovery "[o]nly when 'some unconscionable act of one coming for relief has immediate and necessary relation to the equity that' the party seeks.'" *New Valley Corp. v. Corporate Prop. Assocs. 2 & 3 (In re New Valley Corp.)*, 181 F.3d 517, 525 (3d Cir. 1999). Here, Freedom's alleged wrongful conduct—instructing Janssens to use a competitor's confidential information and seeking Janssens testimony against other former employees—is not immediately and necessarily related to the torts committed by Janssens. In addition, Freedom's attempts to convince Janssens to testify against other former employees do not constitute "unconscionable acts" that would trigger the doctrine's application.

5

III.

Janssens first argues that the Bankruptcy Court erred in identifying and applying the legal standards when it determined that his debt to Freedom was exempt from discharge in bankruptcy under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6). In light of the Bankruptcy Code's primary purpose of providing debtors with a "fresh start," exceptions to discharge must be interpreted narrowly. *Spinoso v. Heilman (In re Heilman)*, 241 B.R. 137, 148 (Bankr. D. Md. 1999) (citations omitted). However, a court must not lose sight of the "equal[] concern[] . . . that perpetrators of fraud" not be permitted "to hide behind the skirts of the Bankruptcy Code." *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 130 (4th Cir. 1999); *see also Cohen v. De La Cruz*, 523 U.S. 213, 217, 118 S. Ct. 1212 (1998) ("The Bankruptcy Code has long prohibited debtors from discharging liabilities incurred on account of their fraud, embodying a basic policy animating the Code of affording relief only to an 'honest but unfortunate debtor.'" (quoting *Grogan v. Garner*, 498 U.S. 279, 287, 111 S. Ct. 654 (1991))). "The various exceptions to discharge in § 523(a) reflect a conclusion on the part of Congress 'that the creditors' interest in recovering full payment of debts in these categories outweigh[s] the debtors' interest in a complete fresh start.'" *Cohen*, 523 U.S. at 222 (quoting *Grogan*, 498 U.S. at 287) (alteration in original). The creditor bears the burden to show by a preponderance of the evidence that an exception applies. *Grogan*, 498 U.S. at 291.

 A. *11 U.S.C. § 523(a)(2)(A)*

Section 523(a)(2)(A) provides, in relevant part, that a "debt for money, property, [or] services" is excepted from discharge to the extent it was "obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). In *In re Biondo*, the Fourth Circuit set forth four elements a creditor must establish for a court to find that a debt is nondischargeable

under 523(a)(2)(A): "(1) a fraudulent misrepresentation; (2) that induces another to act or refrain from acting; (3) causing harm to the plaintiff; and (4) the plaintiff's justifiable reliance on the misrepresentation." *In re Biondo*, 180 F.3d at 134. A fraudulent misrepresentation is "'a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it.'" *Id.* (quoting Restatement (Second) of Torts § 525 (1976)). An affirmative misrepresentation is not required. Where the debtor has a duty to disclose to the creditor, such as an agent's duty to his principal, the debtor's silence may constitute an actionable misrepresentation for the purposes of § 523(a)(2)(A). *See Miller v. Cigna Ins. Co.*, 311 B.R. 57, 61 (D. Md. 2004) (citations omitted). The requisite intent to deceive may be inferred from the surrounding circumstances. *Guar. Residential Lending, Inc. v. Koep (In re Koep)*, 334 B.R. 364, 372 (Bankr. D. Md. 2005) (citing *Kendrick v. Pleasants (In re Pleasants)*, 231 B.R. 893, 898 (Bankr. E.D. Va. 1999)). The creditor's reliance on the representation need not be reasonable; rather, section 523(a)(2)(A) demands only the "minimal standard" of justifiable reliance. *In re Biondo*, 180 F.3d at 135.

The Bankruptcy Court did not abuse its discretion in applying these elements to the instant case. It found that, because Janssens was Freedom's agent and fiduciary, he had an obligation to disclose that he was working for a competitor, and his failure to do so constituted a misrepresentation on which Freedom justifiably relied. Thus, a misrepresentation occurred even before Janssens expressly denied that he was working for companies other than Freedom. Janssens's pecuniary motivation to misrepresent his employment status, as well as his admission that he knew Gwynn and Greco would be displeased that he was working for a competitor, supports the Bankruptcy Court's conclusion that Janssens intended to deceive Freedom. Further, because it found that Freedom continued to pay Janssens a salary and compensation based upon

7

his misrepresentation, the Bankruptcy Court did not abuse its discretion in determining that it caused harm. Freedom, therefore, presented sufficient evidence for a finding of nondischargeability under 523(a)(2)(A).

*B. 11 U.S.C. § 523(a)(4)*

A debt is exempt from discharge under § 523(a)(4) only if the plaintiff "prove[s] that the debt arose out of (1) 'fraud or defalcation while acting in a fiduciary capacity,' (2) 'embezzlement,' or (3) 'larceny.'" *In re Heilman*, 241 B.R. at 151 (quoting § 523(a)(4)). Here, the Bankruptcy Court found that Janssens committed fraud while acting as Freedom's fiduciary and that he embezzled confidential information from Freedom.

The Bankruptcy Court properly applied federal bankruptcy law, rather than state law, in determining whether Janssens was a fiduciary. *See id.* at 155–56. As Janssens asserts, for purposes of § 523(a)(4), the term "fiduciary" does not encompass "such ordinary commercial relationships as creditor-debtor and principal-agent," even though these would be considered fiduciary relations under state law. *Id.* at 159 (internal quotation marks and citations omitted). Rather, the Supreme Court's decision in *Chapman v. Forsyth*, 43 U.S. (2 How.) 202 (1844), dictates that a debtor may be found to be a fiduciary for bankruptcy purposes only if there was an "an express or technical trust, or its equivalent," which can be created only by the "parties' own intent," not by statute. *In re Heilman*, 241 B.R. at 166 (discussing *Chapman*). Under this standard, "fiduciaries" include "public officers, executors, administrators, guardians, trustees of express trusts, attorneys and corporate directors," and others who occupy "positions of ultimate trust." *Id.* at 169–70 (footnotes omitted).

Janssens was not a mere employee. Instead, as a branch director, he was entrusted with sensitive, confidential information and had been designated a "key employee" by his

8

employment contract. (Mem. Op., Conclusions of Law ¶ 58.) Under these facts, the Bankruptcy Court did not abuse its discretion in finding that he occupied a position of ultimate trust, giving rise to fiduciary obligations for bankruptcy purposes. Moreover, as discussed above, he committed fraud by misrepresenting that he was not diverting business from Freedom. Accordingly, I will affirm the Bankruptcy Court's determination that Janssens's debt was nondischargeable under § 523(a)(4).[2]

   *C. 11 U.S.C. § 523(a)(6)*

"[A]ny debt for [a] willful and malicious injury" is nondischargeable under § 523(a)(6). 11 U.S.C. § 523(a)(6). In the landmark case of *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S. Ct. 974 (1998), the Supreme Court held that this section requires "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Id.* at 61 (emphasis in original). It "is not satisfied by negligent, grossly negligent or reckless conduct." *In re Duncan*, 448 F.3d at 729. Instead, an injury may be found to be "willful and malicious under § 523(a)(6) 'only if the actor purposefully inflicted the injury or acted with substantial certainty that injury would result.'" *Viener v. Jacobs (In re Jacobs)*, 381 B.R. 128, 137 (Bankr. E.D. Pa. 2008) (quoting *Conte v. Gautam (In re Conte)*, 33 F.3d 303, 305 (3d Cir. 1994)). A debtor may be assumed to intend the natural consequence of his acts. *Citizens Nat'l Bank v. Vandergrift (In re Vandergrift)*, 35 B.R. 76, 78 (Bankr. D. Md. 1983) (citation omitted). The Bankruptcy Court concluded that Janssens's actions were "willful and malicious" because he "knew that financial harm would result to Freedom as a natural consequence of his intentional acts." (Mem. Op., Conclusions of Law ¶ 61 & n.24.) As a result of Janssens's pecuniary motivations and his

---

[2] Because I have found that the Bankruptcy Court did not abuse its discretion in finding that the debt arose from Janssens's fraud while acting in a fiduciary capacity, I need not consider whether it is also nondischargeable because Janssens committed embezzlement.

9

denials that he was working for competitors, I cannot find that this conclusion constitutes an abuse of discretion.

In sum, the Bankruptcy Court's determination that the debt to Freedom is nondischargeable under §§ 523(a)(2)(A), (a)(4), and (a)(6) will be affirmed.

III.

Janssens contends that the Bankruptcy Court committed reversible error by awarding Freedom the full amount of compensation it paid to Janssens during the period he was working for Quality. Janssens further argues that any award of damages should be reduced by $5,000, the commission Freedom owed Janssens at the time he was fired, and $50,000, the amount paid by Quality to settle Freedom's claims.

A plaintiff's recovery for breach of fiduciary duty is not limited to lost profits. *See Vendo Co. v. Stoner*, 58 Ill. 2d 289, 321 N.E.2d 1, 10 (1974) (observing such a rule would permit a fiduciary to "violate his duty without incurring any risk"). Pennsylvania law provides that "[a] corporate officer . . . forfeits all rights to compensation which might otherwise be due him when he breaches his fiduciary duty to the corporation." *Kassab v. Ragner Benson, Inc.*, 254 F. Supp. 830, 833 (W.D. Pa. 1966) (citations omitted).[3] Janssens urges that, because he performed some services for Freedom's benefit, he must be permitted to keep some of his salary and commissions. The Restatement (Second) of Agency sets forth the following rule regarding the need to apportion the amount of compensation to recompense a disloyal fiduciary for services provided:

---

[3] Although *Kassab* involved a corporate officer suing to recover a commission not yet paid by his former employer, this rule also permits a principal to bring an action to recover compensation previously paid to a fiduciary who is later discovered to have been disloyal. Restatement (Third) Agency § 8.01 cmt. d(2) (2006); Restatement (Second) of Agency § 469 cmt. e (1958).

10

> An agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty; if such conduct constitutes a wilful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned.

Restatement (Second) of Agency § 469 (1958). The Restatement (Third) similarly provides that it should be within a court's discretion to mandate the forfeiture of *all* compensation paid during a period of disloyalty. Restatement (Third) Agency § 8.01 cmt. d(2) (2006). Janssens, the Bankruptcy Court concluded, was a fiduciary—equivalent to a corporate director—of Freedom, and he willfully and maliciously caused Freedom harm by diverting contracts to competitors. Thus, it was not an abuse of discretion to order Janssens to repay the full amount of compensation he received while working against Freedom's interests. As a result of his disloyalty, Janssens has also forfeited any claim to his unpaid commission.

Moreover, the Bankruptcy Court did not err in refusing to reduce this award by the amount of Quality's settlement with Freedom. Pennsylvania's Uniform Contribution Among Tortfeasors Act (UCATA), 42 Pa. Const. Stat. Ann. §§ 8321–8327, states, in relevant part, "A release by the injured person of one joint tort-feasor . . . reduces the claim against the other tort-feasors in the amount of the consideration paid for the release." § 8326. Thus, if, as here, "the settlement agreement is silent, . . . the nonsettling defendant is entitled to have the verdict reduced by the amount of consideration paid by the settling tortfeasor." *Baker v. ACandS*, 562 Pa. 290, 755 A.2d 664, 667 (2000). For this section to apply, however, the settling party and current defendant must be joint tortfeasors, which is defined in the UCATA as "two or more persons jointly or severally liable in tort for the same injury to persons or property." § 8322. "Where '(t)he acts of the original wrongdoer and the (alleged joint tortfeasor) are severable as to time, neither having the opportunity to guard against the other's acts, and each breaching a

different duty owed to the injured plaintiff,' the persons are not joint tortfeasors." *Klotz v. Superior Elec. Prods. Corp.*, 498 F. Supp. 1099, 1100–01 (E.D. Pa. 1980) (quoting *Lasprogata v. Qualls*, 263 Pa. Super. 174, 397 A.2d 803, 805 (Super. Ct. 1979)) (alterations in original). The Bankruptcy Court's award requiring the forfeiture of Janssens's compensation was based on the breach of his fiduciary duty, a duty not shared by Quality. Accordingly, these damages should not be reduced by the amount of Quality's settlement.

IV.

Janssens brought counterclaims for common law abuse of process and malicious use of civil proceedings under 42 Pa. Const. Stat. Ann. §§ 8351 *et seq.*, known as the Dragonetti Act, with respect to Freedom's claims in *Freedom I* and *Freedom II*. The Bankruptcy Court properly rejected these counterclaims.

"'To establish a claim for abuse of process it must be shown that the defendant (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to the plaintiff.'" *Shiner v. Moriarty*, 706 A.2d 1228, 1236 (Pa. Super. Ct. 1998) (quoting *Rosen v. Am. Bank of Rolla,* 426 Pa. Super. 376, 627 A.2d 190, 192 (1993)). A party asserting such a claim "must show '[s]ome definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process . . . . [T]here is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions.'" *Id.* (quoting *Di Sante v. Russ Fin. Co.,* 251 Pa. Super. 184, 380 A.2d 439, 441 (Super. Ct. 1977)) (first alteration in original). Although a lack of probable cause is not an element of the claim, the existence of probable cause may be probative in determining whether the opposing party possessed an improper purpose. *See id*. That Freedom had ample cause to believe that Janssens—its fiduciary and key

employee—had breached its duty to the company, potentially depriving it of valuable contracts and, at minimum, using its confidential information for the benefit of a competitor, strongly supports the Bankruptcy Court's finding that it did not act with an improper purpose in pursuing its claims. Moreover, I am in agreement with the Bankruptcy Court that consideration of evidence of settlement negotiations would not alter this conclusion. Freedom's purpose is not rendered improper merely because it sought, as part of a settlement, Janssens's cooperation in actions brought against other former employees who engaged in wrongful conduct.[4]

The Dragonetti Act provides that a person who has initiated a civil proceeding is liable where:

> (1) He acts in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based; and
> (2) The proceedings have terminated in favor of the person against whom they are brought.

§ 8351. Therefore, in order for a claim under this act to be ripe for adjudication, a prior proceeding must have terminated in favor of the party bringing the claim. *Linker v. Custom-Bilt Mach. Inc.*, 594 F. Supp. 894, 902 (E.D. Pa. 1984). The Bankruptcy Court accurately determined that neither *Freedom I* nor *Freedom II* was terminated in Janssens's favor. In *Freedom I*, the District Court decided the RICO claims on the merits in favor of Janssens, but dismissed the remaining claims on jurisdictional grounds. *Freedom II* was stayed as a result of the commencement of Janssens's bankruptcy action.

---

[4] Although the Bankruptcy Court did not admit evidence of settlement negotiations as Janssens requested, it did note that, were such evidence admitted, it would not affect the outcome with respect to the counterclaims. Because this evidence would have no effect on the result of the case, I will not consider whether it should have been admitted under Federal Rule of Evidence 408.

13

V.

In its cross-appeal, Freedom faults the Bankruptcy Court for denying its claim of tortious interference with prospective contractual relations. To succeed on this claim, Pennsylvania law requires a party to prove the following elements: (1) a "prospective contractual relation"; (2) purpose or intent to harm the plaintiff; (3) the defendant's lack of privilege or justification; and (4) "actual damage resulting from the defendant's conduct." *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466, 471 (1979) (citing *Glenn v. Park Point Coll.*, 411 Pa. 474, 272 A.2d 895, 898 (1971)).[5] The Bankruptcy Court found that Freedom presented insufficient evidence to establish the first element, a prospective contractual relation, and the fourth element, actual damage.

A prospective contractual relation is "something less than a contractual right, something more than a mere hope." *Id.* The Pennsylvania Supreme Court has recognized that "anything that is prospective in nature is necessarily uncertain," so, in order to satisfy this element, a plaintiff need only demonstrate a "reasonable likelihood or probability" that, but for the defendant's conduct, the plaintiff would have entered into the contract. *Glenn*, 272 A.2d at 898–99. Though acknowledging this inherent uncertainty, "Pennsylvania courts have consistently required more evidence than the existence of a current business or contractual relationship" to find a reasonable probability of future contractual relations. *Phillips v. Selig*, 2008 Pa. Super. 244, 959 A.2d 420, 429 (Super. Ct. 2008).

---

[5] Any debt arising from the commission of this tort is nondischargeable under 11 U.S.C. § 523(a)(6) because it is a "willful and malicious injury." *See Corn v. Marks (In re Marks)*, 192 B.R. 379, 385 (E.D. Pa. 1996) ("The tort of intentional interference requires an intent to injure; this makes it a 'willful and malicious injury.' The same standard governs the finding of intentional interference and determination of dischargeability [under section 523(a)(6).]").

The Bankruptcy Court, here, stated that Freedom "has proven only that past customers . . . [of] Freedom rented or purchased medical equipment from Quality, but not that they would have continued to rent or purchase equipment from Freedom but for the misconduct of Janssens." (Mem. Op., Conclusions of Law ¶ 26.) The evidence at trial demonstrated that Freedom's revenues were decreasing across its branches, not merely in Baltimore, indicating that Freedom was losing customers in other locations. Freedom did not present evidence or testimony from any customer demonstrating that it sought to do business with Freedom but was deceived or pressured by Janssens to enter into a contract with Quality instead. Indeed, the only person not affiliated with Freedom or Janssens to testify on this issue was John McMahon, of Quality, who averred that others in the industry questioned the quality of Freedom's services. Based upon this record, I cannot say that, in general, the Bankruptcy Court abused its discretion in concluding that Freedom showed no more than a "mere hope" that it would have received the contracts obtained by Quality. Elsewhere in its Opinion, however, the Bankruptcy Court stated that Freedom *did* establish that, but for Janssens's interference, it would have received a $90,000 sale to Integrated Medical Systems (IMS) occurring in December 2004. (Mem. Op., Conclusions of Law ¶ 42 n.18.) Therefore, if there is sufficient evidence of damages, the Bankruptcy Court's order must be reversed and Freedom must be awarded damages for lost profits for this contract. In the next Part, I will examine the evidence regarding lost profits.

VI.

The Pennsylvania Supreme Court has expounded that "[a]s a general rule, damages are not recoverable if they are too speculative, vague or contingent." *Spang & Co. v. U.S. Steel Corp.*, 519 Pa. 14, 545 A.2d 861, 866 (1988) (citations omitted); *see also Am. Air Filter Co. v. McNichol*, 527 F.2d 1297, 1301 (3d Cir. 1975) ("While we agree that 'the quantum of proof

required to establish the amount of damage is not as great as that required to establish the fact of damage,' it is also elementary that purely speculative damages cannot be recovered." (citations omitted)). "'[R]ecovery will not be precluded simply because there is some uncertainty as to the precise amount of damages incurred,'" as the wrongdoer's conduct has created the necessity of estimating damages. *Spang & Co.*, 545 A.2d at 866 (quoting *Pugh v. Holmes,* 486 Pa. 272, 405 A.2d 897, 909 (1979)). Still, a court is not obligated to accept whatever figure for damages that the plaintiff has asserted, "however uncertain." *Penn Elec. Supply Co., Inc. v. Billows Elec. Supply Co., Inc.*, 364 Pa. Super. 544, 528 A.2d 643, 645 (Super. Ct. 1987). Pennsylvania law requires a plaintiff to establish the amount of damages with "reasonable certainty." *Spang & Co.*, 545 A.2d at 866.[6]

The primary evidence presented by Freedom as to the amount of lost profits is contained in Plaintiff's Exhibit 35. (Appellee/Cross-Appellant's Br., App., Pl.'s Ex. 35 ("Pl.'s Ex. 35"), at

---

[6] Freedom points to statements by Pennsylvania courts that "damages are speculative only if the uncertainty concerns the *fact* of damages rather than the *amount*," to argue that, so long as it establishes a reasonable probability it would have received a contract but for Janssens's actions, the court must award some damages for lost profits, and Janssens bears the risk of uncertainty as to the amount of these damages. *Pashak v. Barish,* 303 Pa. Super. 559, 450 A.2d 67, 69 (Super. Ct. 1982) (internal quotation marks and citation omitted) (emphasis in original); *see also Carroll v. Phila. Hous. Auth.*, 168 Pa. Cmwlth. 275, 650 A.2d 1097, 1100 (Commw. Ct. 1994). However, this is contradicted by the decisions of other Pennsylvania courts—including the Pennsylvania Supreme Court—which mandate that the plaintiff must provide enough information to allow the amount of damages to be fairly estimated. *See, e.g.*, *Ashcraft v. C.G. Hussey & Co.*, 359 Pa. 129, 58 A.2d 170, 172 (1948) ("Our law only requires that a reasonable quantity of information must be supplied by plaintiff so that the jury may fairly estimate the amount of damages from the evidence."); *Penn Elec. Supply Co.*, 528 A.2d at 645 ("The cases hold that plaintiff is not relieved of the burden of proving the amount of damages simply because the defendant 'by his own wrong has precluded a more precise computation of damages.'" (quoting *Locklin v. Day-Glo Color Corp.,* 429 F.2d 873, 879 (7th Cir. 1970))); *Delahanty v. First Pa. Bank., N.A.*, 318 Pa. Super. 90, 464 A.2d 1243, 1257–58 (Super. Ct. 1983) ("Although the law does not command mathematical precision from evidence in finding damages, sufficient facts must be introduced so that the court can arrive at an intelligent estimate without conjecture." (citation omitted)). I agree that a plaintiff is not entitled to recover lost profits unless he submits sufficient reliable evidence to permit a reasonably certain estimation of the amount of damages.

16

FA000154–59.) The Bankruptcy Court characterized this exhibit, stating, "Upon close inspection, the summary is actually a report of gross revenues received by Quality, and not lost profits suffered by Freedom." (Mem. Op., Conclusions of Law ¶ 44.) The first three pages of this six-page exhibit do show, in various forms including a line graph, a bar graph, and a numerical chart, the revenues Quality received from contracts secured by Janssens. (Pl.'s Ex. 35, at FA000154–56.) The chart categorizes the revenue as "Sale Revenue" and "Rental Revenue." Gwynn testified that these numbers were drawn from Quality's Quickbook business records. (Trial Tr. 74:15–74:22 May 4, 2009.) Contrary to the Bankruptcy Court's characterization, the remaining three pages of the exhibit purport to show Freedom's lost profits, also using a bar graph, line graph, and chart. (Pl.'s Ex. 35, at FA000157–59.) Eric Wenzel, Freedom's Chief Financial Officer, testified as to how he calculated lost profits in creating the exhibit. According to Wenzel, he used the average costs of sales and rentals from each year that Janssens diverted contracts to Quality, excluding fixed costs,[7] to determine lost gross profits.[8] (*See* Trial Tr. 45:22–48:6 May 5, 2009.) The Bankruptcy Court, however, deemed Wenzel's testimony regarding damages "suspect." It concluded, "In light of this suspect testimony and in the absence of expert testimony . . . , the plaintiff has failed to substantiate a proper basis for the Court to calculate lost profits." (Mem. Op., Conclusions of Law ¶ 45.)

I first note that, regardless of the evidence submitted as to the amount of damages, the plaintiff may only recover for profits lost from the IMS sales contract, as Freedom failed to show a reasonable likelihood it would have obtained Quality's other contracts. Freedom argues that

---

[7] It is proper, in calculating lost-profits damages, to exclude fixed overhead costs. *SHV Coal, Inc. v. Cont'l Grain Co.*, 376 Pa. Super. 241, 545 A.2d 917, 923 (Super. Ct. 1988), *rev'd on other grounds*, 526 Pa. 489, 587 A.2d 702 (1991).

[8] Although Wenzel testified to the contrary, the exhibit indicates that the amount of commissions was also deducted from revenues to calculate gross profits. (Pl.'s Ex. 35, at FA000159.)

lost profits from the IMS contract may be fairly estimated based upon the calculations in Exhibit 35.

I reject this argument for several reasons. First, the purchase order for this transaction shows that IMS purchased equipment from Quality for $89,150.00 on December 29, 2004. (Appellee/Cross-Appellant's Br., App., Pl.'s Ex. 42, at FA000175.) The lost-profits chart in Exhibit 35, however, contains no information about the average cost of a sale in 2004; indeed, it indicates that sales occurred only in 2005. (Pl.'s Ex. 35, at FA000159.) Second, problems with the calculations in Exhibit 35, and the lack of substantiating evidence, provided a sufficient basis for the Bankruptcy Court to deem Wenzel's testimony suspect and to refuse to rely upon these calculations. Wenzel stated that the gross-profit calculations in the exhibit were based on average cost of sales and of rentals during the relevant year, but Freedom submitted no records to support these averages. Even accepting the testimony given by Freedom's witnesses, the gross-profit calculations Freedom provided are inaccurate. Freedom represented that it would have paid Janssens a 4% or 6% commission for rentals and a 10% commission for sales and that its commissions—unlike those paid by Quality—were calculated based on gross profits, not revenues. (Trial Tr. 24:17–26:10, 33:20–33:23 May 5, 2009; Pl.'s Post-Trial Br., ECF No. 1, Attach. 26, at 6–7.) In Exhibit 35, however, a 4% commission based upon revenue was applied to both rentals and sales.[9] Although the result of this error favors Janssens because it

---

[9] For instance, for 2004, Freedom listed revenue, solely from rentals, of $49,782.80. From this, it subtracted $4,231.54, or 8.5% of revenues, to account for costs. It then subtracted $1,991.31 in commissions, which is 4% of revenues (49782.80 x 0.04=1991.31). If calculated based on gross profits, commissions would be $1822.05 (0.04(49782.80–4231.54)=1822.05).

For 2005, Freedom recorded $343,082.72 in rental revenue and $91,850.00 in sales revenue, from which it deducted $18,183.38, or 5.3%, in costs from rentals, and $56,395.90, or 61.4%, in costs from sales. It further deducted 4% of combined rental and sales revenues, $17,397.31, as commissions (434,932.72 x 0.04=17397.31). It should have deducted 4% of gross profits for rentals, or $12995.97 (0.04(343082.72–18183.38)=12995.97), and 10% of gross

18

underestimates the amount of commissions to be deducted, it calls into question the accuracy of the computations underlying the chart that I—and the Bankruptcy Court—was unable to verify. Finally, I must give due regard to the Bankruptcy Court's judgment regarding Wenzel's credibility. Fed. R. Civ. P. 52(a)(6).

In the final analysis, as a result of the problems with the calculation of damages provided by Freedom, the suspect nature of Wenzel's testimony, the lack of other evidence corroborating Exhibit 35's lost-profits chart, and Freedom's failure to provide information regarding the average cost of sales in 2004, I cannot conclude that the Bankruptcy Court abused its discretion in finding that the evidence on the record failed to establish with reasonable certainty the amount of lost profits related to the IMS sale.[10]

## VII.

The final issue raised in Freedom's cross-appeal is the denial of attorney's fees and costs. In its Memorandum Opinion, the Bankruptcy Court found that an enforceable covenant existed obligating Janssens to reimburse Freedom for attorneys' fees and costs, but the Court refused to issued such an award because Freedom had not submitted documentation indicating the fees and costs it had incurred. On July 8, 2010, twenty-three days after the entry of the Bankruptcy Court's Orders and Judgment, Freedom filed a Motion for Leave to File a Motion for Attorneys' Fees and for the Award of Attorneys' Fees as the Prevailing Party, in which it sought

---

profits for sales, or $3545.41 (0.10(91850.00–56395.90)=3545.41). Total commissions would therefore be $16541.38. Calculations for 2006 included similar errors.

[10] In addition, were I to attempt to use the average cost of sales for 2005 provided by the chart—as Freedom urges—to calculate lost profits for the IMS sale, Freedom would not be entitled to recover this amount. In that case, Freedom would have sustained $30,970.71 in lost profits ((89150.00 x 0.386) – (0.10(89150.00 x 0.386))=30970.71). However, it appears that Janssens and Quality would be jointly and severally liable for these damages, so, as discussed in Part III, *supra*, the amount of Quality's settlement must be deducted from these damages to determine Freedom's recovery from Janssens. Quality's $50,000 settlement exceeds $30,970.71. Hence, Freedom could not recover any lost-profits damages from Janssens.

reimbursement for fees paid to attorneys Gregory Mathews and Charles Obrecht, Jr., and it provided the requisite documentation. The Bankruptcy Court did not consider the motion because it had been divested of jurisdiction by Freedom's previously filed notice of appeal on the issue of attorneys' fees. *See Ingersoll-Rand Fin. Corp. v. Kendrick Equip. Corp. (In re Kendrick Equip. Corp.)*, 60 B.R. 356, 358 (Bankr. W.D. Va. 1986) ("The rule is well established that the taking of an appeal transfers jurisdiction from the Bankruptcy Court to the Appellate Court with regard to any matters involved in the appeal and divests the Bankruptcy Court of jurisdiction to proceed further with such matters." (citations omitted)).

Local Bankruptcy Rules 7054-1 and 7054-2 permit a party to file a motion for an award of costs or attorneys' fees within twenty-one days after the entry of a judgment or an order unless a longer period is fixed by statute or the court. Md. Local Bankr. R. 7054-1 to 7054-2. At this time, I will remand this case to the Bankruptcy Court to determine the sufficiency of the excuses provided by Freedom for the lateness of its Motion.

For the foregoing reasons, the Bankruptcy Court's judgment will be affirmed, and this case will be remanded for determination of the plaintiff's motion for attorneys' fees and costs.


April 29, 2011                          /s/
Date                                      J. Frederick Motz
                                            United States District Judge